******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# D. S. *v.* D. S.
## (SC 20830)

McDonald, D'Auria, Mullins, Ecker, Alexander and Dannehy, Js.*

*Syllabus*

The plaintiff appealed, on the granting of certification, from the judgment of the Appellate Court, which had affirmed the trial court's judgment dissolving his marriage to the defendant, who was a partner at a large law firm. The plaintiff claimed, inter alia, that the Appellate Court had incorrectly concluded that the defendant's interest in a potential stream of retirement payments, which was to be paid pursuant to the relevant provisions of the firm's partnership agreement, was too speculative to constitute marital property subject to equitable distribution under the statute (§ 46b-81) governing, inter alia, the assignment of property in marital dissolution cases. *Held*:

A trial court's determination of whether an asset or interest constitutes marital property for purposes of § 46b-81 presents a mixed question of law and fact subject to de novo review, the trial court's underlying factual findings are reviewed for clear error, and the question of how such determinations as to any particular asset fit into the mosaic of the trial court's financial orders is reviewed for abuse of discretion.

The Appellate Court correctly determined that the defendant's interest in the retirement payments did not constitute property subject to equitable distribution for purposes of § 46b-81.

The defendant did not have an enforceable right to receive the retirement payments insofar as the defendant's firm had a contractual right under the partnership agreement to unilaterally reduce or eliminate them at any time, even after the defendant started receiving them, and, accordingly, the defendant's receipt of the retirement payments was too speculative.

Moreover, changes in the law firm's demographics and compensation structure supported this court's conclusion that the firm's exercise of its authority to modify or terminate the retirement payments was more than a theoretical possibility, and equitable considerations weighed in favor of a conclusion that those payments should be treated as a source of potential income for alimony rather than a nonmodifiable property distribution.

---

* This case originally was argued before a panel of this court consisting of Chief Justice Robinson and Justices McDonald, D'Auria, Mullins, Ecker, Alexander and Dannehy. Thereafter, Chief Justice Robinson retired from this court and did not participate in the consideration of the case.

The listing of justices reflects their seniority status on this court as of the date of oral argument.

The Appellate Court correctly concluded that the trial court had not abused its discretion in awarding the plaintiff alimony that was contingent on the defendant's remaining an active partner at her law firm or on her being a retired partner receiving retirement payments from the firm.

The trial court weighed all of the factors enumerated in the alimony statute (§ 46b-82 (a)), as well as the equitable factors and the circumstances relevant to the dissolution of the parties' marriage, and crafted an alimony order with the intent of ensuring that the plaintiff would be financially supported for a limited time period and of incentivizing the plaintiff to initiate a good faith job search and to acquire employment commensurate with his earning capacity.

(*One justice dissenting*)

Argued February 7, 2024—officially released January 7, 2025

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *Diana, J.*, rendered judgment dissolving the marriage and granting certain other relief, from which the plaintiff appealed to the Appellate Court, *Prescott, Suarez* and *Bishop, Js.*, which affirmed the trial court's judgment, and the plaintiff, on the granting of certification, appealed to this court. *Affirmed.*

*Charles D. Ray*, with whom was *Justyn P. Stokely*, for the appellant (plaintiff).

*Kenneth J. Bartschi*, with whom were *Karen L. Dowd* and, on the brief, *Thomas P. Parrino* and *Randi R. Nelson*, for the appellee (defendant).

*Opinion*

DANNEHY, J. In this appeal, we consider whether an interest in an unfunded retirement benefit constitutes property pursuant to General Statutes § 46b-81, when that interest will never vest because it may be unilaterally revoked by a third party at any time. The plaintiff,

D. S.,[1] appeals from the judgment of the Appellate Court affirming the trial court's judgment of dissolution.[2] On appeal, the plaintiff claims that the Appellate Court incorrectly concluded that the interest of the defendant, D. S., in a potential stream of retirement payments (retirement payments) pursuant to the partnership agreement of her law firm (firm) was too speculative in nature to constitute marital property subject to equitable distribution under § 46b-81. The plaintiff further claims that the Appellate Court incorrectly concluded that the trial court did not abuse its discretion in ordering an alimony award that was tied to her employment at the firm.[3] We affirm the judgment of the Appellate Court.

The record reveals the following relevant facts, either undisputed or found by the trial court. The plaintiff and

[1] During the course of the trial in this case, the trial court ordered certain documents to be sealed and, at times, closed the hearings. Consistent with the Appellate Court's modification of those sealing orders pursuant to its authority under Practice Book § 77-2 (a), in this opinion, we do not refer to the parties or their children by name and do not identify any of the parties' past or present employers. See *D. S.* v. *D. S.*, 217 Conn. App. 530, 532–33 n.1, 289 A.3d 236 (2023).

[2] The plaintiff filed a petition for certification to appeal from the judgment of the Appellate Court to this court. We granted the plaintiff's petition for certification, limited to the following issues: (1) "Did the Appellate Court correctly conclude that the defendant's interest in her law firm's retirement plan was too uncertain to qualify as martial property subject to equitable distribution pursuant to General Statutes § 46b-81?" And (2) "[d]id the Appellate Court correctly conclude that the trial court had not abused its discretion in awarding alimony that . . . was terminable at the defendant's sole discretion and . . . was specific to the defendant's employment at one particular firm?" *D. S.* v. *D. S.*, 346 Conn. 924, 924, 295 A.3d 419 (2023).

[3] The defendant contends that the plaintiff's claim challenging the court's alimony award is unpreserved. We disagree. The defendant's proposed financial orders included the provision that the plaintiff now disputes, that the defendant's alimony obligation would be limited to her association with the firm, either as an active partner or a retired partner receiving retirement payments. Although the plaintiff failed to raise this particular argument in the trial court in response to the court's direction, on March 5, 2021, to do so, during closing argument, the plaintiff's counsel contended that the defendant's proposed financial orders would "crush" the plaintiff and argued that the court should not adopt them. Additionally, as we discuss subsequently in this opinion, the plaintiff raised this issue in his motion to reargue.

defendant married in 1990, and have two children, one of whom was a minor at the time of trial.

The defendant is a partner at a large law firm, and earns an annual gross income of approximately $8 million. Until he was laid off in 2001, the plaintiff worked as an investment banker, earning more than $1 million in his most successful year. After 2002, the plaintiff made no real financial contribution to the family. Although he subsequently started his own private equity firm, this venture (and others) was unsuccessful, and that firm was dissolved several years later. During this time, in addition to managing her own growing professional responsibilities, the defendant performed legal work for the plaintiff's assorted failed business ventures, paid his employees' salaries, and handled two tax audits. At the time of the dissolution, the plaintiff had not worked for an employer for approximately eighteen years.

Despite the defendant's considerable income, the plaintiff's unchecked spending resulted in the family's accumulation of substantial debt. Although the defendant tried to institute restraints, the plaintiff rejected her efforts to demonstrate that their financial situation was dire and that his spending was unsustainable. Eventually, the defendant decided to stop providing the plaintiff with documentation of her income. The plaintiff's spending only accelerated, and the defendant was forced to borrow extensively to meet the family's financial obligations. At the time of dissolution, the defendant continued to borrow money through a line of credit to meet the family's financial obligations. Throughout this time, the plaintiff refused to seek employment, despite his impressive educational credentials and experience in the investment banking profession.

The plaintiff also terrorized the family emotionally and physically with his explosive anger, jealousy, and attempts to control the defendant's behavior. On occa-

sions when the defendant suggested that he obtain employment, the plaintiff became "unglued and belligerent, responding usually by yelling and swearing at the defendant." He sometimes verbally abused the defendant in front of their children. On one occasion, while the defendant was showering, the plaintiff slammed the shower door so hard that the door shattered, and shards of glass injured the defendant. The trial court found that the plaintiff was solely responsible for the breakdown of the marriage due to his abusive behavior and mismanagement of the family's finances.

In 2017, the plaintiff commenced this dissolution action seeking joint custody, child support, alimony, and an equitable division of the property in the marital estate. Following a twenty day trial, the court rendered judgment dissolving the marriage. The trial court issued financial orders relating to parenting, child support, costs for the children's schooling and activities, alimony, health insurance and related costs, the disposition of the parties' assets and liabilities, and attorney's fees. Relevant to the two issues presented in this appeal, first, the court determined that the defendant's interest in the retirement payments pursuant to the partnership agreement did not constitute property for purposes of § 46b-81. Specifically, the court found that the defendant's interest in the retirement payments involves "variables, risks and requirements that are not fixed and impossible to determine at this time." In making its finding, the court relied primarily on the testimony of the defendant's expert witness, Mark Harrison, regarding the nature of the defendant's interest. The court concluded that the interest constituted a "mere expectancy" and had no value at the time of dissolution. Accordingly, the trial court treated these potential payments as a future stream of income to be awarded as alimony pursuant to General Statutes § 46b-82, rather than as property subject to distribution pursuant to

§ 46b-81. Second, the court ordered the defendant to pay the plaintiff $35,000 per month in alimony for the first twelve months after the date of dissolution, and $30,000 per month thereafter. The court ordered that this alimony obligation would terminate when the defendant was no longer employed as an active partner at the firm. Once the defendant ceased to be an active partner, as long as she was receiving retirement payments pursuant to the partnership agreement, she would be obligated to pay alimony to the plaintiff in the amount of 25 percent of her net after-tax income actually received. The court ordered that this alimony obligation would terminate upon the death of either the plaintiff or the defendant but not upon the plaintiff's remarriage.

The trial court further ordered that the defendant's alimony obligation, both prior to and after her employment as an active partner with the firm, would be "nonmodifiable upward and nonmodifiable as to increases in duration." The trial court denied the plaintiff's subsequent motion to reargue, which had challenged, among other aspects of the court's judgment, the alimony and property awards. The plaintiff appealed from the judgment of dissolution to the Appellate Court, which affirmed the judgment of the trial court. *D. S.* v. *D. S.*, 217 Conn. App. 530, 532, 552, 289 A.3d 236 (2023). This certified appeal followed. Additional facts will be set forth as necessary.

I

The plaintiff first contends that the Appellate Court and the trial court incorrectly concluded that the defendant's interest in the retirement payments was too uncertain to qualify as marital property subject to equitable distribution pursuant to § 46b-81. On the basis of the unique facts of this case, we conclude that the retirement payments did not constitute property.

The record reveals the following additional facts relevant to our resolution of this issue. As we noted previously in this opinion, in concluding that the defendant's interest in the retirement payments was a mere expectancy, the court credited and relied heavily on Harrison's expert testimony. Harrison, in turn, relied in part on a report prepared by the plaintiff's witness, Henry Guberman,[4] which describes the details of the retirement payments as set forth in the partnership agreement. In particular, Guberman's report explained the provisions in the partnership agreement governing a retired partner's eligibility to receive the retirement payments and setting forth the methodology used to calculate that partner's benefit.

In his testimony, Harrison described some general, foundational facts helpful to understanding the nature of the defendant's interest in the retirement payments. He pointed out that the payments to retired partners pursuant to the partnership agreement are not listed as a liability on the firm's financial statements. He explained that, in order to qualify as a liability for purposes of accounting, the interest must "be probable to be paid in [a] reasonably estimable . . . amount." Because the firm does not consider these payments a liability, therefore, it would be a "leap" to categorize the payments as an asset. Additionally, he testified, the payments are not funded. The firm does not maintain any capital, so the payments are paid out from future earnings. He further testified that payments to a retired partner pursuant to the partnership agreement are not transferable and not salable.

Harrison also testified regarding numerous contingencies on which the defendant's receipt of any pay-

---

[4] The plaintiff had proffered Guberman as an expert witness, but, following an extensive voir dire of Guberman by the defendant's counsel, the trial court declined to qualify him as an expert. Like Harrison, Guberman was unable to arrive at any conclusions regarding the present value of the payments that the defendant might receive upon her retirement.

ments pursuant to the partnership agreement depend. Those contingencies include the termination of the payments altogether, any amendments to the partnership agreement, any violation by the defendant of the agreement's noncompete clause, and the firm's continued operation.

Most significant, Harrison testified that, pursuant to the partnership agreement, the firm, "by the mutual consent of the then [p]artners constituting at least three-fourths in number and having at least 75 [percent] of the total [p]oints," has the authority unilaterally to end the program, terminating payments to former partners at any time. In addition, Harrison testified that there are several provisions of the partnership agreement, the amendment of which would impact both the likelihood of a retired partner's receiving the payments and the quantity of any such payments. For example, amendments can and have been made to certain of the variables used to calculate a retired partner's benefit, thus changing the amount of the resulting payments. Harrison testified that these variables had been reduced over the years and that the partnership agreement authorized the firm to make further reductions, all of which present an additional risk that impacts whether the firm will make the payments.

Harrison also testified regarding changes the firm had made to its calculation of an active partner's expected benefit. Specifically, in 2020, the firm moved away from a compensation system based entirely on seniority (lockstep), replacing that system with one that, instead, prioritizes a partner's production level. According to Harrison, this change meant the firm recognized that not all partners are equal, and the firm needed to attract partners who could generate business in order to keep the firm profitable and "around for a long . . . time."

As to the firm's continued operation, Harrison observed that "twenty-two firms . . . almost [the] size [of the

defendant's firm] have disbanded or gone bankrupt since the financial crisis in 2007." Harrison recognized that the firm had been around for a long time and was "top shelf" but noted that "there have been a lot of good firms that have had problems."

## A

Our cases have not been entirely consistent as to the standard of review that governs a trial court's determination that a particular asset or interest constitutes marital property for purposes of § 46b-81, which presents a mixed question of law and fact. Several of our cases arguably have reviewed that determination under an abuse of discretion standard. See, e.g., *Dombrowski* v. *Noyes-Dombrowski*, 273 Conn. 127, 132–33, 869 A.2d 164 (2005); *Smith* v. *Smith*, 249 Conn. 265, 285–88, 752 A.2d 1023 (1999); *Eslami* v. *Eslami*, 218 Conn. 801, 808, 591 A.2d 411 (1991). For the most part, however, our recent decisions have indicated that the question ultimately is one of statutory interpretation—whether a particular asset or asset class qualifies as "property" for purposes of § 46b-81—and, therefore, is subject to our plenary review. See, e.g., *Reville* v. *Reville*, 312 Conn. 428, 446, 93 A.3d 1076 (2014); *Mickey* v. *Mickey*, 292 Conn. 597, 613, 974 A.2d 641 (2009); *Bender* v. *Bender*, 258 Conn. 733, 741, 785 A.2d 197 (2001). We take this opportunity to clarify the standard.

We have recognized that "applying the label" of "mixed question of law and fact" does not necessarily resolve the applicable standard of review. *Bortner* v. *Woodbridge*, 250 Conn. 241, 264, 736 A.2d 104 (1999). As the United States Supreme Court has explained, the standard of review applicable to mixed questions of law and fact depends on the nature of the mixed question, and requires us to consider "which kind of court . . . is better suited to resolve" the question. *U.S. Bank, N.A.* v. *Village at Lakeridge, LLC*, 583 U.S. 387, 395,

138 S. Ct. 960, 200 L. Ed. 2d 218 (2018). When the resolution of the mixed question of law and fact requires courts to "expound on the law, particularly by amplifying or elaborating on a broad legal standard," the standard of review is de novo. Id., 396. Our decisions addressing the question of whether a particular marital asset constitutes property for purposes of § 46b-81 invariably have expounded upon the meaning of the statutory term "property." Accordingly, the standard of review of a trial court's determination whether an asset is classified as "property" is de novo.

The trial court's underlying factual findings, however, are reviewable under a clearly erroneous standard and will be reversed only if they find no support in the record or the reviewing court is left with the definite and firm conviction that a mistake has been made. See, e.g., *FuelCell Energy, Inc.* v. *Groton*, 350 Conn. 1, 14, 323 A.3d 268 (2024); *Bornemann* v. *Bornemann*, 245 Conn. 508, 527, 531, 752 A.2d 978 (1998). Lastly, the question of how these determinations as to any particular asset fit into the mosaic of all the trial court's financial orders is reviewable for abuse of discretion.

B

We turn our attention, then, to the legal standard for determining whether a particular interest that was acquired during the marriage constitutes divisible marital property for purposes of § 46b-81. Section 46b-81 provides in relevant part: "(a) At the time of entering a decree annulling or dissolving a marriage . . . the Superior Court may assign to either spouse all or any part of the estate of the other spouse.

* * *

"(c) In fixing the nature and value of the property, if any, to be assigned, the court, after considering all the evidence presented by each party, shall consider

the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates.''

Our legislature has not defined the term "property" in § 46b-81, leaving courts to define it. In determining the equitable distribution of resources under the statute, courts should engage in a three step process, determining (1) whether the resource is property (classification), (2) what is the appropriate method for determining the value of the property (valuation), and, (3) what is the most equitable distribution of that property between the parties (distribution). *Krafick* v. *Krafick*, 234 Conn. 783, 792–93, 663 A.2d 365 (1995). Over the past one-half century, in considering the classification of marital assets, this court and the Appellate Court have refined the definition of what does, and does not, qualify as marital property for the purposes of § 46b-81. At one end of the spectrum, it is well established that certain categories of future interests, such as vested pension benefits and contractually guaranteed stock options, qualify as marital property per se, because the holder has a presently enforceable right to receive them. See, e.g., *Bornemann* v. *Bornemann*, supra, 245 Conn. 517–20 (stock options); *Krafick* v. *Krafick*, supra, 793–98 (vested pension benefits).[5] At the other end of the spectrum,

---

[5] We have previously defined the term "vested" to refer to "pension interests 'in which an employee has an irrevocable . . . right, in the future, to receive his or her account balance (under a defined contribution plan), or his or her accrued benefit (under a defined benefit plan), regardless of whether the employment relationship continues.' [3 A. Rutkin, Family Law and Practice (1995) § 36.13 [2], p. 36-71; see id., § 37.11 [1] [b], pp. 37-157 through 37-159; see also 2 A. Rutkin et al. Valuation and Distribution of

certain types of future interests categorically do not qualify as marital property, because the possessor's present interest in them "is, at best, [a] speculative . . . [and] inchoate [hope]" that has none of the attributes of property and, instead, constitutes a mere expectancy. (Internal quotation marks omitted.) *Krause* v. *Krause*, 174 Conn. 361, 365, 387 A.2d 548 (1978). Examples of these include interests in a potential inheritance; see, e.g., id.; interests in future earnings from a professional degree; see, e.g., *Simmons* v. *Simmons*, 244 Conn. 158, 164, 708 A.2d 949 (1998); and a contingent remainder interest in a revocable inter vivos trust. See, e.g., *Rubin* v. *Rubin*, 204 Conn. 224, 227–28, 527 A.2d 1184 (1987).

This court has articulated and refined a two part test by which trial courts may determine, on a case-by-case basis, whether a potential interest constitutes divisible marital property under § 46b-81. In the first part of the *Bender* test, we ask whether the holder has "a *presently* enforceable right [to receive the interest] . . . based on contractual principles or a statutory entitlement . . . ." (Citation omitted; emphasis added.) *Mickey* v. *Mickey*, supra, 292 Conn. 628 (citing *Bender* v. *Bender*, supra, 258 Conn. 733). If the party has such a right, the interest is part of the marital estate and is distributable as property. *Mickey* v. *Mickey*, supra, 625. If the party does not have a presently enforceable right, we proceed to the second part of the *Bender* test, which involves a more fact intensive analysis. See id., 625–27.

The second part of the *Bender* inquiry is "built [on the] foundation" established by our prior cases defining property for purposes of § 46b-81. *Bender* v. *Bender*, supra, 258 Conn. 753. In *Bender*, we explained that an interest that falls short of a presently enforceable right nevertheless qualifies as divisible marital property if a

Marital Property (1991) § 23.02 [2] [a], p. 23-8] . . . ." (Citation omitted.) *Krafick* v. *Krafick*, supra, 234 Conn. 788–89 n.12.

party's expectation in the interest "as a practical matter, is sufficiently concrete, reasonable, and justifiable as to constitute a presently existing property interest for equitable distribution purposes." Id., 749. This second prong of the *Bender* inquiry recognizes that the definition of "property" for purposes of equitable distribution should not be given a "narrow construction." (Internal quotation marks omitted.) Id., 753. We did not purport in *Bender*, however, to overrule our prior precedent defining property for purposes of § 46b-81. See id. The focus of the inquiry remains on obtaining an enforceable right in the interest. Our focus in the second prong, however, is on the likelihood that the holder *eventually* will acquire an enforceable right in the interest, that is, whether the interest will likely vest or whether the holder will otherwise acquire a definitive right to it. See *Mickey* v. *Mickey*, supra, 292 Conn. 628 ("[w]e conclude that *Bender* stands for the proposition that, even in the absence of a presently enforceable right to property based on contractual principles or a statutory entitlement, a party's expectant interest in property still may fall under § 46b-81 if the conditions precedent to the eventual acquisition of such a definitive right are not too speculative or unlikely").

In *Mickey*, we collected and synthesized the considerations relevant to a trial court's assessment of whether the party's interest is so speculative that it does not constitute property for purposes of § 46b-81, or, by contrast, is "sufficiently *concrete*, *reasonable* and *justifiable* as to constitute a presently existing property interest for equitable distribution purposes." (Emphasis in original; internal quotation marks omitted.) Id.

Under the second part of the *Bender* inquiry, a central question that courts consider is whether the party's "right" to the interest is one that always can be unilaterally revoked, meaning that the holder will never have a vested interest, or amended by a third party. That a will

may be revised until the moment of death, or a revocable trust revoked, explains, in no small part, why those interests are too speculative to qualify as part of the marital estate.

We recognize a lack of consistency in our law regarding whether, in assessing what weight should be given to a third party's unilateral authority to revoke or modify a right to a future interest, a trial court should consider the likelihood that the third party will ever exercise that authority. In *Bender*, we considered the likelihood of exercise relevant to the inquiry. In that case, we assumed the municipality had the authority to discontinue the pension plan before the interest vested but, nevertheless, described the exercise as merely a theoretical possibility that did not prevent the unvested pension from constituting a presently existing property interest. *Bender* v. *Bender*, supra, 258 Conn. 749. We also assumed in *Mickey* that disability benefits were terminable at the state's discretion at any time before the defendant suffered an injury. *Mickey* v. *Mickey*, supra, 292 Conn. 630–31. In *Mickey*, however, we stated that "the likelihood that the legislature would decide to modify or terminate the disability benefits . . . is irrelevant to our analysis," and that what mattered was simply that it had the authority to do so. (Emphasis omitted.) Id., 631 n.26. We take this opportunity to clarify that, because the second prong of the *Bender* inquiry focuses on the likelihood that a party will eventually obtain an enforceable legal right, the *likelihood* that a third party will exercise its right to unilaterally revoke or modify a party's right to a future interest is relevant to the analysis.

In addition to the authority of a third party to unilaterally terminate a party's right to receive the future interest, and whether the likelihood that the third party will exercise its authority is merely theoretical, courts also consider the nature of other contingencies involved,

that is to say, other risks that the party will never obtain a right to the interest. The nature of these contingencies or risks sheds light on the reasonableness of the party's expectancy in the interest. A prudent person will not plan her retirement in reliance on the expected receipt of an income source that can be unilaterally denied to her, or that she is unlikely ever to receive, or the receipt of which is subject to incalculable risks. See, e.g., id., 628–29 and n.22; *Dombrowski* v. *Noyes-Dombrowski*, supra, 273 Conn. 132–33; *Bender* v. *Bender*, supra, 258 Conn. 754. This, in turn, may depend on considerations such as whether a potential income source has been funded, and whether it is transferable and negotiable. See, e.g., *Simmons* v. *Simmons*, supra, 244 Conn. 168–69.

Finally, in light of the equitable nature of dissolution proceedings, we have suggested that equitable considerations may be taken into account when assessing whether a potential interest should be considered part of the marital estate. In *Mickey*, we explained that the trial court must retain "a measure of flexibility to avoid a patently unfair result. For example . . . this approach allows a court to avoid the inequity that would occur if the marriage dissolves shortly before one of the spouse's pensions vests, especially when the pension is the primary marital asset." *Mickey* v. *Mickey*, supra, 292 Conn. 630. In addition to whether the interest represents the primary marital asset, other relevant equitable considerations include whether the benefit "represent[s] the 'fruits' of the marital partnership that § 46b-81 is designed to equitably parse"; id., 631; and whether it can be characterized as a form of deferred income that was earned and otherwise would have been enjoyed during the marriage. See, e.g., id., 632; *Bender* v. *Bender*, supra, 258 Conn. 752.

C

With these principles in mind, we turn our attention to the present case. It is undisputed that the defendant's

interest in the retirement payments does not qualify as property under the first part of the *Bender* test, because she has no legally enforceable present right to receive it. The parties disagree, however, as to whether the defendant's interest in the retirement payments qualifies as divisible marital property under the second part of the *Bender* test. Our review of the relevant considerations persuades us that it does not.

First, not only does the defendant have no presently enforceable right to receive the retirement payments, but she never will. At any time, before and even after the defendant begins to receive retirement payments, the firm has a contractual right under the partnership agreement to unilaterally reduce or cancel those payments. The firm reserves the right to terminate the program for all retired partners, or for an individual former partner, by a three-quarters vote of the partnership. The firm's contractual authority to terminate the program or the defendant's payments thereunder at any time and "without any ascertainable standard" was central to Harrison's opinion, credited by the trial court, that the defendant's interest in her retirement payments was "the epitome of a mere expectancy." Harrison testified that he had evaluated the retirement programs of many law firms and other professional service companies but that he had "never seen anything like" the provision of the partnership agreement that allowed a small committee to recommend the suspension of a partner's retirement payments if it determined, for any reason, that paying it would be inequitable to the remaining partners and the firm.

As a result of the firm's contractual authority to unilaterally terminate the payments, even after the defendant begins to receive them, the defendant's interest in the stream of retirement payments will never vest, and the defendant will never have a contractual cause of action against the firm for continued payments. The plaintiff does not contend otherwise. This significant

fact distinguishes the defendant's interest from the unvested pension at issue in *Bender*, where we simply assumed the municipality had the authority to discontinue the pension plan, despite recognizing that the record was silent on the defendant's rights under the collective bargaining agreement and without reference to any contractual authority providing such authority. *Bender* v. *Bender*, supra, 258 Conn. 749 and n.6

In addition, we described in *Bender* the employer's exercise of its assumed authority to discontinue the pension plan as simply "theoretically possible . . . ." Id., 749. In the present case, however, *other* risks involving, for example, changes in the firm's demographics and compensation structure, support our conclusion that its exercise of its authority to terminate or amend the retirement payments is more than a theoretical possibility. The trial court determined that, even assuming the firm continues to exist in its present form, there was a real possibility that it would, at some point, cease paying the retirement payments. That factual finding, which would be reviewable for clear error if the plaintiff had challenged it, finds support in Harrison's and the defendant's testimony, both of which the trial court credited, and business records that had been created long before the present action was initiated. Such evidence tended to show that, although the firm had never failed to make payments under the partnership agreement, demographic pressures had resulted in fundamental changes to the firm's partnership compensation structure, led to significant cuts in partners' retirement payments, and called into question the long-term viability of the program.

Over time, as a result of normal demographic trends,[6] the ratio of retired partners to active partners at the

---

[6] See, e.g., R. Zahorsky, "Pensions Howling at the Door: WolfBlock Dissolution Underlines the Danger," 95 ABA J. (June, 2009) pp. 28, 30 (discussing unsustainability of unfunded law firm pension plans as baby boom partners retire).

firm has risen steadily. Between 1990 and 2015, the ratio of retired to active partners had more than tripled. Equally significant, of the remaining active partners, the number who were fifty years of age or older was substantially higher in 2015 than it had been in 1990, suggesting that the demographic pressures would only continue to intensify.

The potential impact of these increasing pressures on the firm's finances was not merely a matter of speculation. At the time of trial, those pressures already had resulted in significant changes that, Harrison testified, were necessary "to keep this firm from imploding." The firm had made a series of cuts to the retirement payments, and the result of these ongoing cuts was that the retirement income received by a partner was expected to fall by as much as 50 percent between 2015 and 2040, with the average yearly payment (in constant dollars) dropping to $400,000. In addition, as of January 1, 2021, the firm discontinued its pure lockstep, or seniority, method of compensating partners and moved to a modified system that places a premium on partners' production levels.

Harrison testified that these recent developments reduced the likelihood that a retired partner would ultimately receive a retirement payment that met the partner's expectations, or receive one at all. He specifically testified as to the interrelated nature of the risks, stating that the transition away from the lockstep method of compensation, together with fewer active partners having to support more retirees, meant that "the biggest and best producers are going to say, 'why do I want to be here, let me go to another firm that has funded their retirement [plans] . . . .'" Harrison testified that, despite the firm's long history and prestige, it might cease operating. He explained that this was not a mere theoretical possibility because, in the fourteen years between the 2007 financial crisis and the date of dissolu-

tion, twenty-two firms of nearly the same size had disbanded or gone bankrupt, more than one and one-half each year.

The defendant, who was familiar with the firm's present financial condition at the time of trial, concurred with Harrison's view that the contingencies to which her receipt of the retirement payments was subject rendered the interest a mere expectancy. According to the defendant, "[g]iven that we [had] moved to a modified lockstep compensation system, the current pension calculation doesn't really work and is going to have to be amended at some point. [The] partnership agreement . . . could be amended and . . . the payments could be eliminated." The defendant testified that "those payments are subject to a variety of conditions and uncertainty, and are not necessarily something I can count on." This testimony is consistent with the 2016 prelitigation presentation, during which the defendant warned the firm's partnership that the retirement payments could be cut by one half over the next twenty-five years and concluded with a message, one that the trial court reasonably could have interpreted as a caution to the partners that they should not rely on the retirement payments when engaging in retirement planning. At trial, the defendant characterized the presentation as showing "partners how they needed to save for retirement because payments postretirement were uncertain." There was credible evidence, then, that the defendant did not treat her interest in the retirement payments as property, in the sense of a reliable source of retirement income, and that, long before the present action was commenced, she had, on behalf of the firm, advised her partners against relying on it.[7] Additionally, with the

---

[7] The plaintiff and the dissent construe the defendant's 2016 presentation to mean that the firm had taken the steps necessary to shore up its finances. But the trial court, as the finder of fact, reasonably could have embraced the interpretation, advanced by both Harrison and the defendant, that the *best case* scenario was a significant, ongoing cut in payments and that the worst case scenario was a total termination of the program.

exception of the plaintiff's testimony that he and the defendant had contemplated eventually moving to Wyoming on the basis of the plaintiff's belief that they would pay fewer or no taxes on the defendant's retirement income, the plaintiff offered no other testimony or evidence that the parties had ever factored in the defendant's retirement payments when planning for retirement.

Harrison opined, for example, that the defendant's retirement payments could amount to "anything from zero to a lot of money," and he stated that, if he were to attempt to place a present value on the expected payments, the amount would be so low, in light of these various risks, that he would lose his credibility before the trial court. For her part, the defendant testified that the retirement payments "can, and, in all likelihood, will be reduced over time. [T]here's no way to calculate exactly what those payments will be, *if any*." (Emphasis added.) The firm's executive director, who was responsible for the new partner financial presentations, gave substantially similar testimony, agreeing that "no one can possibly know, within a reasonable degree of certainty, the amount, *if any*, that [the defendant] may receive . . . upon her departure from the firm." (Emphasis added.)

Consistent with the testimony of both Harrison and the defendant, the trial court found that the retirement payments were "unique in form and substance . . . ." The fact that the firm has struggled with intensifying demographic pressures and had, shortly before trial in the present case, transitioned to a new partnership compensation structure, in tandem with the fact that the partnership agreement contains the unique escape valve allowing the firm to terminate payments under the retirement payments at any time, provides more than adequate support for the trial court's determination that "[the] stream of payments involves variables,

risks and requirements that are not fixed and [are] impossible to determine," and, therefore, that it was too speculative to qualify as a presently existing property interest.

The plaintiff claims that the fact that it is impossible to predict the size of the retirement payments that the defendant will receive, and, thus, to calculate the present value of the defendant's interest in those payments with any certainty, did not preclude the trial court from classifying it as property because there are other methods of distributing marital assets. See, e.g., *Bender* v. *Bender*, supra, 258 Conn. 750 n.7 (noting that, regardless of length of employee's service, unvested pension constituted marital property, and observing that "the trial court could choose simply not to distribute it because its value—not its classification—was too insignificant *or conjectural* in the marital scheme of things" (emphasis added)). According to the plaintiff, if we conclude that the defendant's interest in the retirement payments is not so speculative as to be a mere expectancy, the trial court could have treated the interest as property and assigned each party some fixed percentage of whatever payments she ultimately receives. But Harrison did not merely testify that this range of contingencies made it impossible to place a present value on the defendant's potential retirement payments. Rather, he concluded that the range and scope of contingencies rendered the defendant's receipt of the retirement payments too speculative to qualify as property.[8]

---

[8] We observe that, even if the trial court had determined that the defendant's interest in the retirement payments was property, the court would have been well within its discretion to do exactly what it did and, instead, award the plaintiff a 25 percent share as alimony. See General Statutes § 46b-82 (court may order alimony "in addition to *or in lieu of*" award of property (emphasis added)); see also, e.g., *Mickey* v. *Mickey*, supra, 292 Conn. 630 and n.24 (court has discretion to consider equities of situation and to fashion alimony award that accounts for marital asset). Because there is no indication in the record that the trial court contemplated this alternative approach, any determination by this court regarding the propriety of any such action by the trial court would require speculation.

The plaintiff points to a 2016 email exchange in which the defendant estimated that, at that time, her retirement payments might have a present value of $14 million. The trial court reasonably could have declined to afford any weight to that evidence, in light of (1) the agreement of both parties' experts that the retirement payments were impossible to value with any degree of confidence, (2) the plaintiff's testimony that her 2016 email likely reflected "a back of the envelope calculation that one of [her] partners had done," and (3) the fact that the email exchange itself indicated that it was predicated on optimistic assumptions as to discount rates and that, "with the cutback, the pension isn't worth much."

Finally, we examine relevant equitable considerations, such as whether the interest in question is the divorcing couple's primary asset or source of retirement security. That certainly was not the case here. Aside from the retirement payments, the defendant owned three conventional retirement plans through the firm: a Keogh plan valued at almost $1.8 million, a 401k plan valued at over $1.5 million, and a defined benefit pension plan with an annual benefit of approximately $197,000. The trial court awarded 35 percent of the value of each of those plans—well over $1 million—to the plaintiff. And, notably, the judgment did not deny the plaintiff a share of the defendant's retirement payments; he simply would receive his share of any payments in the form of alimony, rather than as a property distribution.

Other equitable considerations also weigh in favor of the trial court's conclusion that the retirement payments should be treated as a source of potential income for alimony, rather than a nonmodifiable property distribution. The court found that the plaintiff was entirely responsible for the breakdown of the marriage, both financially and relationally. The court found that "the plaintiff did not contribute to the acquisition, preserva-

tion or appreciation of the parties' assets [but, rather, that] he was the primary reason the assets were recklessly depleted and wasted." The court faulted the plaintiff's "rage," "verbal intimidation," "constant arguing and abusive behavior," and "obsessive, jealous, threatening" conduct for the breakdown of the marriage, concluding that the plaintiff had "terrorized the family emotionally and physically with his rage, explosive anger, control and jealousy." The court also found that the plaintiff had an earning capacity of "$150,000 after about six months of [short-term or] gig assignments and selective placement by a professional placement service." Nevertheless, the court granted the plaintiff generous property and alimony awards and required the defendant to assume the majority of the couple's debts. The plaintiff will not be left destitute, and he did not suffer any injustice, as a result of the trial court's property distribution and alimony awards.

In conclusion, there was adequate support in the record for the trial court's factual findings. On this factual record, and in light of the trial court's credibility determinations, we conclude that the trial court correctly determined that the defendant's receipt of the retirement payments was too speculative to constitute property for purposes of § 46b-81.[9]

We have two primary disagreements with the dissenting opinion. First, although, if we had been the triers of fact, our own findings might be guided by the same sorts of commonsense intuitions that animate

---

[9] The plaintiff contends that the conclusion that the defendant's interest in the retirement payments does not qualify as divisible marital property is in tension with the determination reached by several other courts that substantially similar retirement plans are marital property. See, e.g., *Hussey* v. *Hussey*, Docket No. FST-FA-01-0183296-S, 2003 WL 21494762, *4 (Conn. Super. June 11, 2003); *Douglas* v. *Douglas*, 281 App. Div. 2d 709, 712–13, 722 N.Y.S.2d 87 (2001); *Wright* v. *Wright*, 61 Va. App. 432, 451–53, 737 S.E.2d 519 (2013). None of those decisions is binding on this court, however, and each is readily distinguishable.

much of the dissent, as an appellate tribunal, we must accept, unless clearly erroneous, the factual findings and credibility determinations made by the trial court. Those findings firmly ground the trial court's determination that the defendant's interest in the retirement payments is too speculative to qualify as present marital property. Second, with respect to the governing legal principles as applied to the facts found by the trial court, we have a fundamental disagreement as to what constitutes property under § 46b-81, as construed by this court in *Bender* and its progeny.

As we discussed, although the property question ultimately is a legal one, to the extent that it hinges on underlying factual findings, credibility determinations, and assessments of the probability of various outcomes, we defer to the trial court unless its findings and determinations are clearly erroneous. The dissent relies throughout its opinion on its own assumptions and determinations regarding the defendant and her law firm, untethered from the trial court's memorandum of decision, everything from the firm being "among the most profitable . . . in the world" to "shock" at anyone questioning its financial future.

At the same time, despite the lack of any claim in this appeal that the trial court's factual findings and credibility determinations were clearly erroneous, the dissent affords no deference to the findings that the trial court did make, such as the court's determination that the defendant's expert witness was credible and its reliance on that expert's testimony in concluding that the defendant's interest amounted to a mere expectancy. Harrison provided detailed testimony regarding the unique nature of the partnership agreement and the retirement payments. He also testified without objection that, on the basis of his analysis, the retirement payments were a mere expectancy. After stating that it credited Harrison's testimony, the trial court found:

"This stream of payments involves variables, risks and requirements that are not fixed and impossible to determine at this time. This future income is not carried as a liability by the law firm on [its] books, not guaranteed, not transferable, not salable, not funded and can be entirely eliminated at any time. Thus, its value today is found to be a mere expectancy." The dissent's analysis rejects the trial court's determination to credit Harrison's testimony, despite the lack of any challenge to that determination in this appeal.[10]

In addition to being grounded on an improper rejection of the factual findings and credibility determinations of the trial court, the dissent's analysis is predicated on an incorrect premise: that, pursuant to *Bender*, retirement benefits of all types qualify as marital property per se. Neither *Bender* nor any of the subsequent cases applying its expanded understanding of marital property support the dissent's reading of that case. When this court considered in *Bender* whether unvested government pension benefits qualified as property subject to equitable distribution pursuant to § 46b-81, it could have adopted a per se rule that retirement benefits qualify as marital property. It did not. Instead, as we explained previously in this opinion, the second part of the *Bender* inquiry requires trial courts to engage

---

[10] The dissent contends that Harrison's testimony that the defendant's interest in the retirement payments is "the epitome of a mere expectancy" went to the "ultimate legal issue" in the case and is entitled to no weight. As we noted, the plaintiff's counsel did not object to this testimony, and the plaintiff does not in this appeal challenge its admission into evidence. Therefore, whether the court abused its discretion in admitting this single statement is not before this court. We note, however, that the finder of fact is an experienced trial judge, and, notwithstanding the dissent's assertions to the contrary, it is clear from the record and the memorandum of decision that the trial court made an independent determination of whether the retirement payments were property under the statute and did not merely rely on Harrison's statement that the interest was a mere expectancy. The trial court also credited the testimony of the defendant, who was familiar with the firm's financial condition at the time of trial and who echoed Harrison's analysis that it was possible that the firm would have to terminate the retirement payments altogether.

in a probabilistic assessment of the claimed property interest to determine whether the interest is too speculative to constitute property subject to equitable division.[11] That is, pursuant to *Bender* and its progeny, in determining whether a retirement benefit constitutes property under § 46b-81, trial courts must assess the likelihood that the owning spouse will ever acquire a legally enforceable right to that retirement benefit. See *Mickey* v. *Mickey*, supra, 292 Conn. 628 ("*Bender* stands for the proposition that, even in the absence of a presently enforceable right to property based on contractual principles or a statutory entitlement, a party's expectant interest in property still may fall under § 46b-81 if the conditions precedent to the eventual acquisition of such a definitive right are not too speculative or unlikely"); id., 623 n.19 (question turns on whether third party can unilaterally revoke interest); see also id., 641 n.8 (*Norcott, J.*, concurring and dissenting) ("[U]nder the second prong of *Bender* . . . our inquiry properly would focus on the likelihood that an enforceable right to such benefits would be obtained . . . and not on

---

[11] As the present case illustrates—and as this court may not have contemplated when crafting its rule in *Bender*—retirement benefits come in myriad forms, some of which defy a probabilistic assessment. One treatise has observed that, "[i]n recent years . . . there is now a broad general consensus that retirement plans *of all types* . . . constitute property" for purposes of equitable distribution. (Emphasis altered.) 2 B. Turner, Equitable Distribution of Property (3d Ed. 2005) § 6:22, p. 135; see, e.g., Ala. Code § 30-2-51 (b) (1) (Supp. 2023) ("The marital estate is subject to equitable division and distribution. Unless the parties agree otherwise, and except as otherwise provided by federal or state law, the marital estate includes any interest, whether vested or unvested, either spouse has acquired, received, accumulated, or earned during the marriage in any and all individual, joint, or group retirement benefits including, but not limited to, any retirement plans, retirement accounts, pensions . . . ."); Fla. Stat. Ann. § 61.075 (6) (West 2019) ("[a]s used in this section . . . (a) 1. '[m]arital assets and liabilities' include . . . e. [a]ll vested and nonvested benefits, rights, and funds accrued during the marriage in retirement, pension, profit-sharing, annuity, deferred compensation, and insurance plans and programs"). Neither of the parties, however, has asked this court to revisit *Bender* or to adopt a per se rule that retirement benefits of all types accrued during the marriage constitute property, a step that would be necessary in order to adopt the dissent's position.

whether the benefits were likely actually to be received. See *Bender* v. *Bender*, supra, 258 Conn. 749–50 (analyzing likelihood that defendant would obtain enforceable right to unvested pension benefits, and not likelihood that such benefits subsequently would be received)." (Emphasis omitted.)).

Nor do two other cases cited by the dissent, *Reville* v. *Reville*, supra, 312 Conn. 428, and *Tilsen* v. *Benson*, 347 Conn. 758, 299 A.3d 1096 (2023), demand a different result. In *Reville*, in one brief aside, this court suggested that, under *Bender*, the trial court would have been required to treat an unvested pension as distributable property. See *Reville* v. *Reville*, supra, 458. That comment, however, was dictum, in light of our repeated statements in that decision that resolving the property question was not necessary to the resolution of the case. Id., 458–59. The comment also was made without the benefit of any discussion of the relevant considerations summarized in *Mickey* and, indeed, without any analysis of the specific details of the plan. To the extent that our statement in *Reville* was predicated on a view that any unvested retirement plan or income source categorically qualifies as marital property, we again clarify that, under *Bender* and *Mickey*, whether an unvested plan qualifies as marital property requires a fact-specific analysis according to the considerations discussed in those cases. See, e.g., *Czarzasty* v. *Czarzasty*, 101 Conn. App. 583, 594, 922 A.2d 272 (requiring case-by-case analysis under § 46b-81), cert. denied, 284 Conn. 902, 931 A.2d 262 (2007).

The dissent also cites *Tilsen* for the proposition that distributions from a limited partnership were marital property, even though the plaintiff in that case never would obtain an enforceable right to receive those distributions under the partnership agreement. That characterization glosses over the fact that this court never determined that the interest at issue in *Tilsen* was property. Rather, we relied on the parties' stipulation that it be treated as such.

See *Tilsen* v. *Benson*, supra, 347 Conn. 806. Moreover, to the extent that the trial court in that case made any independent findings concerning the property question, those findings, contained in a footnote, were dicta to the effect that the parties previously had relied on the distributions as part of their budget and as a source of retirement savings. See id., 804, 806 n.26. In that regard, *Tilsen* simply exemplifies the equitable exception that both *Bender* and *Mickey* left open, and is readily distinguished from the present case, in which the defendant's testimony, credited by the trial court, established that she did not view the retirement payments as something she could "count on."

## II

The plaintiff next claims that the trial court abused its discretion by awarding alimony that was specific to the defendant's employment at one particular firm.[12] On the

[12] The plaintiff also claims that the trial court improperly delegated its authority by ordering that the defendant's alimony obligation would automatically terminate when she was no longer employed as an active partner at the firm. Specifically, the plaintiff claims that the alimony order unlawfully permits the defendant to stop paying alimony, without seeking approval from the court, simply by changing her employment. The trial court's order in the present case stands in sharp contrast to the one at issue in this court's recent decision in *R. H.* v. *M. H.*, 350 Conn. 432, 433, 324 A.3d 720 (2024), in which we reversed in part the judgment of the trial court on the basis that the court improperly delegated its authority when it gave a parent the authority to "decide the nature and scope of the visitation of his ex-spouse . . . ."

In the present case, the court's order did not give the defendant the authority to make a binding decision as to the terms of her alimony obligation to the plaintiff. The trial court, not the defendant, determined the appropriate amount of alimony and then articulated the circumstances under which it would terminate. The court concluded that the plaintiff should receive alimony as long as the defendant is employed as an active partner at her firm or is receiving retirement payments pursuant to the firm's partnership agreement. Although the defendant has some measure of control over when these requirements would no longer be satisfied, the determination of the conditions themselves was not left to her discretion. Accordingly, we conclude that the court did not delegate its authority to the defendant. We find the plaintiff's arguments to the contrary unpersuasive.

basis of the facts of this case, and applying the required deferential standard of review, we disagree.

"An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did . . . . In determining whether a trial court has abused its discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action." (Internal quotation marks omitted.) *Birkhold* v. *Birkhold*, 343 Conn. 786, 808–809, 276 A.3d 414 (2022). "In determining whether alimony shall be awarded, and the duration and amount of the award, the court shall consider the evidence presented by each party and shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability and feasibility of such parent's securing employment." General Statutes § 46b-82 (a). Although our review is limited to whether the court correctly applied the law and reasonably concluded as it did, it is "well established that, in awarding alimony, the trial court must take into account all the statutory factors enumerated in . . . § 46b-82 (a) and that its failure to do so constitutes an abuse of discretion." (Footnote omitted.) *Oudheusden* v. *Oudheusden*, 338 Conn. 761, 768–69, 259 A.3d 598 (2021). "The trial court does not need to give each factor equal weight or make express findings as to each factor, but it must consider each factor. . . . In addition, it is a long settled principle that the defendant's ability to pay is a material consideration in formulating financial awards. . . . Finally, the trial court's financial orders must be consistent with the purpose of alimony:

to provide continuing support for the nonpaying spouse, who is entitled to maintain the standard of living enjoyed during the marriage as closely as possible. . . . When exercising its broad, equitable, remedial powers in domestic relations cases, a court must examine both the public policy implicated and the basic elements of fairness." (Citations omitted; internal quotation marks omitted.) Id., 769.

Under the trial court's alimony order, the duration and amount of alimony are contingent on the defendant's being either an active partner in the firm or a retired partner receiving retirement payments. That is, the initial alimony award (after the first twelve months postdissolution) in the amount of $30,000 per month will cease when the defendant is no longer an active partner in the firm. After the defendant ceases to be an active partner, to the extent that she receives the retirement payments pursuant to the partnership agreement, she is obligated to pay the plaintiff alimony in the amount of 25 percent of her net after-tax income. The plaintiff claims that this order improperly conditions the defendant's alimony obligation on her association with the firm, either as an active or retired partner receiving the retirement payments.

The alimony order in the present case reflects the trial court's intention to ensure that the plaintiff would be financially supported for a limited time period, specifically, while the defendant remained an active partner at the firm and, thereafter, if and during the time that the defendant received the retirement payments from the firm. The trial court explained that the purpose of the duration and amount of its alimony order was to "provide the plaintiff with the financial incentive to initiate a good faith job search and acquire employment commensurate with his earning capacity so that he may contribute toward his own expenses."

The record reveals that the trial court weighed the appropriate statutory and equitable factors in crafting

its alimony order. The trial court described the parties' financial circumstances as "dire" and found that, beginning in 2016, the plaintiff's spending habits "accelerated considerably and were out of control." The plaintiff had voluntarily been out of work for eighteen years and had not sought employment since 2008. The plaintiff explained his refusal to seek employment by contending that he was responsible for caring for the parties' children while the defendant worked. Although such an arrangement would not be unreasonable, the court explicitly rejected the plaintiff's contention that he was too busy in this role to secure a job. At the time of the trial in 2021, the defendant had, since 2018, been paying the plaintiff pendente lite monthly alimony of $37,500 per month. On the basis of the expert testimony of a psychologist, the court determined, however, that the plaintiff had an earning capacity of $150,000 after about six months of "gig assignments . . . ." Although the court acknowledged that, given the plaintiff's age and medical concerns, a "focused genuine effort" on his part would be necessary to find productive employment, it nevertheless found that he would be able to do so, provided he did make such an effort.

The trial court also concluded that the plaintiff was "solely responsible and at fault" for the breakdown of the marriage and that the "emotional cost" he inflicted on the defendant and the family could not be measured. The court found that "[t]he plaintiff's behavior destroyed the love, respect and foundation of this marriage." The court noted that the plaintiff had "terrorized the family emotionally and physically with his rage, explosive anger, control and jealousy," and characterized him as "a bully who verbally, physically and financially abused the defendant and exposed their children to his deportment." The trial court found that, during the marriage, the defendant "paid and paid and paid as the plaintiff [had] become her biggest creditor." The trial court

described the plaintiff as the primary reason the marital assets were recklessly depleted and wasted. The trial court's memorandum of decision describes a "rampage" that included, despite the defendant's efforts to curb the plaintiff's spending, "tens of thousands of dollars in credit card charges each month at restaurants, traveling, buying expensive designer clothing and gifts, and leasing expensive foreign cars (and horses) . . . ." The trial court noted that the defendant struggled to keep up with the bills and had no alternative but to regularly secure "enormous loans to meet the [plaintiff's] extravagant spending behavior" and that, as a result, the defendant was "left dealing with carrying debt that [was] overwhelming . . . ."

We have previously observed that, although alimony "is not to be considered either as a reward for virtue or as a punishment for wrongdoing, a spouse whose conduct has contributed substantially to the breakdown of the marriage should not expect to receive financial kudos for his or her misconduct." *Robinson* v. *Robinson*, 187 Conn. 70, 72, 444 A.2d 234 (1982). There is no indication that the court fashioned the defendant's alimony with an intent to punish the plaintiff for his behavior. But, in light of the foregoing factors—including the plaintiff's "considerable" potential to earn his own income on the basis of his "personal effort" and his sole responsibility for the breakdown of the marriage—the limitations imposed by the court were an appropriate exercise of its discretion.

The plaintiff, however, challenges the duration of the alimony order, insofar as it is contingent on the defendant's affiliation with the firm. According to the plaintiff, the trial court abused its discretion in tying the alimony award to the defendant's being an active partner at the firm, because she could leave the firm at any time.

It is well established that a trial court may award time limited alimony for the purpose of allowing a spouse to become self-sufficient. See, e.g., *Dan* v. *Dan*, 315 Conn. 1, 11, 105 A.3d 118 (2014) ("[u]nderlying the concept of time limited alimony is the sound policy that such awards may provide an incentive for the spouse receiving support to use diligence in procuring training or skills necessary to attain self-sufficiency" (internal quotation marks omitted)); *Bornemann* v. *Bornemann*, supra, 245 Conn. 539 ("rehabilitative alimony, or time limited alimony, is alimony that is awarded primarily for the purpose of allowing the spouse who receives it to obtain further education, training, or other skills necessary to attain self-sufficiency").

The fact that the plaintiff has suggested hypothetical scenarios in which he could be disadvantaged by the conditions of the alimony order does not render the order unreasonable. Although the plaintiff introduced evidence that, in 2016, he and the defendant had discussed some of the potential financial implications that could result if she were to leave her firm, she never did so. Rather, the defendant testified that she did not know when she would retire. She also stated, however, that she was "unlikely to be able to work . . . past sixty-two" because "[t]he average retirement age at [the firm] is sixty." The defendant never testified that she planned to leave the firm before her retirement. The defendant described that her amended proposed order with respect to alimony was intended to give her some "breathing room" to pay down debts while she was still an active partner in the firm, because she would be unlikely to work at the firm past the age of sixty-two. The defendant also testified that the age of sixty-two was significant because, at that time, she would no longer be receiving income from the firm. Although she would then be entitled to retirement payments under the partnership agreement, the defendant noted that

"those payments are subject to a variety of conditions and uncertainty, and are not necessarily something I can count on." The trial court found that the defendant's testimony was "credible and reliable." Accordingly, it fashioned an order based on the premise that the defendant would continue to be employed as an active partner at her firm for approximately five more years before retiring, during which time the plaintiff would be entitled to monthly payments of $30,000 in alimony. Furthermore, the court ordered that the plaintiff would be entitled, limited by either his or the defendant's death, to a percentage of any retirement payments the defendant might receive, providing him with additional, potentially long-term, support. The trial court did not abuse its discretion by limiting the duration of the plaintiff's first alimony award to the duration of the defendant's employment as an active partner at the firm and the plaintiff's second alimony award to the defendant's potential receipt of the retirement payments. Provided the plaintiff obtained a job and adjusted his lifestyle, the court anticipated that such an arrangement would allow him to "live comfortably." Contrary to the plaintiff's assertions, he has not demonstrated that this order was irrational or inconsistent with the purpose of the alimony statute.

In reviewing an alimony order, we do not substitute our judgment for that of the trial court, which is in the best position to fashion an effective and equitable arrangement. An award of alimony is permissive, not mandatory, and "rest[s] in the sound discretion of the trial court . . . ." *Debowsky* v. *Debowsky*, 12 Conn. App. 525, 526, 532 A.2d 591 (1987). Here, it is apparent that the trial court considered the various circumstances attending the dissolution of the parties' marriage and issued an order that would provide the plaintiff with appropriate financial support. We do not suggest that conditioning alimony on a party's relation-

ship with a particular employer is appropriate in every instance, and this case should not be read to so hold. Under the unique facts of this case, however, it was reasonable for the court to expect that the defendant's departure from her firm would coincide with her retirement from full-time employment. We therefore conclude that the Appellate Court correctly held that there was no abuse of discretion.

The judgment of the Appellate Court is affirmed.

In this opinion McDONALD, D'AURIA, MULLINS and ALEXANDER, Js., concurred.